IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1994 SESSION

FILED

June 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellant, | ) | No. 01C01-9402-CC-00038 |
| | ) | |
| | ) | |
| | ) | Maury County |
| v. | ) | |
| | ) | Hon. William B. Cain, Judge |
| | ) | |
| CHRISTOPHER LANGLEY, | ) | (Sentencing) |
| | ) | |
| Appellee. | ) | |

For the Appellant:                    For the Appellee:

Charles W. Burson                     Dana C. Holloway
Attorney General of                   810 South Garden Street
 Tennessee                            P.O. Box 339
   and                                Columbia, TN 38402-0339
Kimbra R. Spann
Assistant Attorney General
 of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

T. Michael Bottoms
District Attorney General
  and
Robert C. Sanders
Assistant District Attorney
 General
Maury County Courthouse Annex  Building
Columbia, TN 38401

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The state appeals as of right from the Maury County Circuit Court's imposing a minimum sentence upon the defendant, Christopher Langley, and granting him probation. The defendant was convicted in a jury trial of aggravated child abuse, a Class B felony,[1] for which he received the minimum sentence of eight years for a Range I, standard offender. The state contends that the trial court erred in imposing a minimum sentence and granting probation given the presence of several enhancement factors and the seriousness of the offense.

The victim of the offense is the defendant's stepson, who was ten months old at the time of the offense. On Wednesday, February 24, 1993, the defendant called his wife at her place of employment and advised her that the victim had fallen off the couch, hit his head and was not acting right. The couch was located in a carpeted room. The victim's mother asked the defendant to bring the child to her so that she could look at him. When they arrived, the baby was sleeping and seemed to be fine. Later that day, the victim's father picked him up for visitation. The defendant told the child's father that the child had fallen off the couch and that he should keep an eye on him. The victim's father also exercised his visitation with the child the following Friday evening through Sunday evening.

A written statement signed by the defendant was introduced into evidence by the state. In this statement, the defendant said that he began to notice the symptoms shortly after the victim returned home from weekend visitation with his natural father.

---

[1]After the events in this case, the statute under which the defendant was prosecuted was amended, effective July 1, 1994, to provide that aggravated child abuse of a victim six years of age or less is a Class A felony. See T.C.A. § 39-15-402 (Supp. 1996).

The victim's father testified that when he picked his son up on February 24, 1993, the defendant told him that the victim had fallen off the couch and that if he started acting funny, to bring him back and they would take him to the clinic. The father stated that his son's behavior was unusual in that he lay limply in his arms and while in his car seat, his eyes were rolling back in his head and he was acting like he was "super tired." He said that he took the victim to a mall, but the child "just acted lifeless, like he was really sick and tired and drained out." He stated that he then took the victim home around 7:30 that evening and told the defendant that they should take the victim to a doctor. The following Friday, the victim visited with his father for the weekend. The father testified that the victim "acted like he had an ear infection, playing with his ear, and he had a stiff neck." When he returned the victim to the defendant's home, he said he told them that the victim had been taking long naps and slept the whole weekend, had a stiff neck and was playing with his ear. The father denied that he did anything to harm the victim.

The victim continued to exhibit certain symptoms of illness or injury and an appointment was made to see a doctor on Thursday, March 4, 1993. On the day of the appointment, the victim started having seizures. He was taken to the Maury County Regional Hospital where tests revealed a fracture of the back portion of the skull and a collection of fluid within the skull. The victim was transported to Vanderbilt Hospital where tests confirmed a crack in the skull and the presence of large collections of fluid. The fluid had the appearance of "old blood" with some clotting that was partially dissolved.

The initial treatment at Vanderbilt Hospital consisted of removing portions of the blood clots by inserting a needle through the skull. This was done on multiple occasions for several days. Then, a permanent drainage device was inserted through the victim's skull. The neurosurgeon who treated the victim at Vanderbilt testified that

this consisted of a little "three millimeter tube that is fed into that space between the brain and skull, and then tunneled underneath the skin into the abdominal cavity, and the fluid just drains in there, essentially, continuously, over a period of months or even years." The victim was hospitalized for approximately twenty days. The neurosurgeon testified that although the injury had the potential to interfere with the victim's future development, he could not say for certain that there was or was not any permanent brain damage.

There was no evidence introduced that disclosed the exact manner in which the injuries were actually inflicted upon the victim. However, the doctor who examined the child at the Maury County Regional Hospital testified that to cause such injuries, a "very significant force" was required, such as a "blow to the head or a significant fall." Also, the neurosurgeon testified that he concluded, previously from the types of blood clots found, that a great deal of force had been applied to the victim's head. He said that a fall from a normal height couch to a carpeted floor would not cause such injuries. He stated that he believed that the child was abused and assaulted. Also, although acknowledging that the injuries could have been accidental, he believed the type of accident that might cause such injuries would be "a high-speed motor vehicle accident where a car was going 40, 60 miles an hour and stopped in a matter of micro-seconds, or some fall from a great height, say, 10, 15, twenty feet."

The jury found the defendant guilty. At the sentencing hearing, the state presented two witnesses. Melinda Langley gave the following testimony. She had been previously married to the defendant. Their marriage ended in divorce and the defendant subsequently married his present wife, the victim's mother.

At the time this witness and the defendant married, she had a ten-month-old child from a prior relationship. They met in Boise, Idaho. She testified concerning

4

a child abuse investigation conducted by Idaho authorities, apparently concerning both her and the defendant. Her child had apparently been badly bruised and the Department of Human Services removed the child from her custody and placed him in foster care with her mother. This child was eventually placed for adoption.

Later, she and the defendant married and she became pregnant. She testified that the defendant had "a big problem with marijuana" and that the defendant smoked pot in the parking lot while she was in labor. She further testified that they left Boise, Idaho, and moved to Tennessee after the defendant was charged by his former employer with "some sort of embezzlement or something." She testified as to one occasion when the defendant put liquor in their son's baby bottle. She confronted him and he promised never to do it again.

Their marriage deteriorated, and she testified concerning the defendant's actions during the course of the separation and divorce. She said that he assaulted her, that he intentionally rammed her car with his car, that the police caught him at her bedroom window with cameras and other equipment and that the police found a marijuana pipe in his car. She said the police told her they were going to charge him with possessing drug paraphernalia. She further testified that there was one incident when the defendant rammed her car at an intersection, knocking her into the intersection, while their son was in the car with her. Also, she stated that while the victim in the present case was in the hospital, the defendant called her and admitted that he had been the one to bruise her child in Idaho, but said that he did not hurt the victim.

Tracy Langley, the defendant's wife and the mother of the victim, was the other witness who testified for the state. She described an incident that occurred in January of 1993. She had been out looking for a job and the victim was left with the

5

defendant. When she returned, the defendant told her that the victim had fallen in his playpen and hit a toy. He had a cut on his head. She went to work that afternoon and when the defendant picked her up at 11:00 that night, he told her that the victim had fallen again and hit his chin on the coffee table. Within a day or two, the victim starting acting lethargic, sleeping often and throwing up. The first diagnosis was a strep infection. Later, the victim was treated at Vanderbilt Hospital. She stated that the doctors told her that the victim's sodium was low in his blood and that this could be caused by a blow to the head. She stated that during the time the victim was at Vanderbilt Hospital being treated for the abuse for which the defendant was convicted, the doctors, at that time, told her that they had discussed reporting the prior incident as the possible result of child abuse.

She also stated that the defendant was never violent with her and that she never saw him harm the victim in any way. She added that while the victim was hospitalized, the defendant appeared very concerned about his condition. She and the defendant were separated at the time of the trial.

The defendant's father and mother testified at the sentencing hearing on behalf of the defendant. The defendant's father testified that the defendant was an ideal son growing up, that he was an honor student, that he is not violent, that he is not a criminal and that he is a good human being. He testified that the defendant loved his son very much and had an excellent relationship with him. He said that the victim's mother was concerned about the victim's father hurting the victim during visitation. He further stated that the defendant could live in his home if the court granted probation.

The defendant's mother corroborated her husband's testimony. She said that the defendant is a very gentle person. She further testified that she knew that her son did not hurt the victim and that even though the jury found him guilty, he was not

6

guilty. She stated that to send the defendant to prison for something that he did not do would probably "ruin him for life, if not a whole lot of other people with it."

Two witnesses from the defendant's former place of employment testified that the defendant was an excellent employee, that he got along well with everyone, and that he definitely would have a job there if granted probation. A friend of the defendant's family testified that the defendant was a fine person and that she had never seen him show any signs of violence at all. The defendant submitted numerous letters of support from various individuals.

The defendant testified at the sentencing hearing. He stated that the incidents of alleged abuse in Idaho involved both him and his former wife spanking the child, but that they never intended to hurt the child. He denied assaulting his former wife, stating "maybe it was a cornering." He said that he and his former wife had a long custody battle. He stated that he, at one time, had a marijuana problem, but that it had been over a year since he had "touched anything."

The defendant said he was asking the court for probation "mainly, because I didn't do anything to Taylor. I didn't harm him in any way." He denied knowledge of any warrant outstanding in Idaho for his arrest for embezzlement or theft. He stated that he did run into his ex-wife's car with his, but it was accidental. He admitted that he intentionally hit her car from behind at the time his child was in the vehicle, but said that it was at about five miles an hour and was just a bump.

The presentence report reflects that the defendant is a high school graduate with a good employment record. He has no previous criminal convictions and was twenty-three years old at the time of sentencing.

In imposing the sentence, the trial court stated the following:

The matter of the enhancing factors and the weight that they are to be given is a matter that addresses itself to the discretion of the trial judge. Two factors are apparent; that is, the previous incident in Idaho, and the age of the child.

Mr. Langley has an exemplary record throughout his life in all instances save those involving a child of very tender years. He has been convicted. His behavior doesn't make rational sense, but then seldom does child abuse make rational sense.

The long and the short of it is, I've either got to apply the enhancing factors and send him to the penitentiary, or apply the minimum sentence and put him on eight years of probation. No matter how we try to cut it, that's the alternative, and that's all of the alternatives that are available to the Court.

No useful purpose will be served by confining him. The defendant will be sentenced to eight years in the Department of Correction as a Standard Range I offender.

The application for probation will be granted on rather strict conditions, Mrs. Moorehead, that are going to have to be coordinated with Judge Shipley in Nashville, relative to this child, Josh.

The child is his. He must have a relationship with the child, but that is a matter that really addresses itself to Judge Shipley, not to the criminal court. But your operations are going to have to be coordinated with Judge Shipley.

During the course of probation, or at least until further hearing, Mr. Langley is to have no contact with minor children. He is to undergo such therapy and such counseling as you deem to be most appropriate.

I say that because, as observed before, Mr. Langley's record, beyond these incidents involving these small children, is an exemplary record. He is a hard worker. He has worked all of his life. He is a good employee. He has the potential to be a functioning citizen. His employer like[s] him. He has family support.

But on the other side of that coin is that we have a seriously injured child, who somebody -- and the jury says Mr. Langley -- brutally beat. And that child, and other children similarly situated, are going to be protected and the Court has to assume at this point that this defendant is guilty, and that he will be subjected to such intensity of supervision as to make certain that this does not happen to anybody else.

I recognize . . . I'm taking a chance. Probably a chance that, on the hard core of the record, might not be justified. But

8

that's a shot I have to call, and I have to take the responsibility for it.

The trial court is to exercise its discretion in determining the specific sentence and the appropriate combination of sentencing alternatives with that discretion to be guided and limited by the sentencing laws. See State v. Moss, 727 S.W.2d 229, 235-38 (Tenn. 1986). In this respect, the 1989 Sentencing Act mandates procedures, while enabling the trial court to exercise its discretion within those procedures. Thus, to determine the appropriate sentence, the trial court is required to consider:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and
>
> (6) Any statement the defendant wishes to make in his own behalf about sentencing.

T.C.A. § 40-35-210(b).

The trial court's sentencing decision is given the presumption of correctness upon appellate review. T.C.A. §§ 40-35-401(d) and -402(d). For review purposes, the trial court is to place on the record the enhancement or mitigating factors if found to exist and to make findings of fact upon which application of the sentencing principles was based. T.C.A. §§ 40-35-209(c) and -210(f). In this fashion, the presumption of correctness of the trial court's action "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166,

169 (Tenn. 1991). Ultimately, the function of appellate review is to insure that the trial court complied with the sentencing laws in setting a sentence and if it did, the sentence will be affirmed even if we would prefer a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The state argues that pursuant to T.C.A. § 40-35-114(1), the defendant's history of criminal behavior relative to child abuse, assaultive behavior, marijuana use and theft should enhance his sentence. It contends that pursuant to T.C.A. § 40-35-114(4), the sentence should be enhanced because the victim's age rendered him particularly vulnerable. Also, it submits that T.C.A. § 40-35-114(15) applies in that the defendant, as the victim's stepfather, abused a position of private trust. Regarding probation, the state notes that enhancing the sentence to more than eight years would render the defendant ineligible for a suspended sentence. See T.C.A. § 40-35-303(a). Finally, it argues that even if the minimum sentence is appropriate, the nature and circumstances of the offense are sufficiently serious as to render probation inappropriate.

Regarding the length of a sentence, although the trial court has no authority to enhance a sentence above the minimum without the existence of a statutory enhancement factor, see T.C.A. § 40-35-210(c), it is not required to enhance solely because such a factor is shown to apply. It remains within the trial court's discretion to determine what weight, if any, the factor merits given the totality of the circumstances of the case. See T.C.A. § 40-35-210(d) (if enhancing but no mitigating factors, "the court may set the sentence above the minimum  . . . .") and Sentencing Commission Comments; State v. Moss, 727 S.W.2d at 235. Thus, the mere fact that an enhancement factor applies does not call for a rote increase in a sentence. Moreover, the trial court's assessment of the weight to be given applicable factors does not occur in a vacuum. Essentially, this means that the trial court may view a

10

defendant's positive circumstances to mitigate against an enhanced sentence, a consideration which it is entitled to make. See, e.g., T.C.A. § 40-35-113(13). Also, it must be done with adherence to the statutory sentencing principles.

> The Act, in order to accomplish its "foremost purpose," which is to "promote justice," provides that the sentence imposed must be the least severe necessary to achieve the punishment justly deserved, to assure fair and consistent treatment of all defendants, to prevent crime, and to promote respect for the law.

State v. Ashby, 823 S.W.2d at 168. It is a case-by-case process.

In reviewing the trial court's findings and determinations in this case, we note that they do not expressly address every contested fact or claim against the defendant. In this respect, it is important that a trial court's findings are sufficiently discernable from the record to afford proper appellate review. However, one can rationally conclude from the trial court's statements that it did not accredit a lot of what the defendant's former wife claimed and gave no significance to the defendant's discontinued marijuana abuse or to the car collision incident occurring during domestic strife. Also, it is obvious that the trial court found that the positive aspects of the defendant's background and personal circumstances outweighed the negative, including the circumstances surrounding the offense.

In other words, after hearing all of the testimony, observing the witnesses testify, reviewing the circumstances of the case and the presentence report, including the many letters in support of the defendant, the trial court determined that the defendant's previous history and the particular vulnerability of the victim did not warrant an increase in the sentence above the minimum provided by law. It is also apparent that the trial court viewed those qualities about the defendant which are conducive to a grant of probation to be relevant to the length of the sentence to be imposed. Whether we view such consideration as the application of mitigating factors under T.C.A. § 40-35-113(13) or as simply a reduction in the weight given the enhancement factors under

the totality of the circumstances, we conclude that the record before us contains sufficient evidence to support the length of the sentence imposed by the trial court.

Moreover, although the trial court did not specify the defendant's abuse of a position of private trust as an enhancement factor,[2] the record shows that the court was fully aware of the facts upon which such factor is based. In fact, it shows that the trial court addressed its concern about the defendant's future contact with his child or any other young children by barring such contact and by requiring appropriate counseling. Thus, we believe that the trial court did assess the relevant culpability of the defendant under the facts supporting enhancement factor (15), even though it did not note its application.

As for the manner of service of the sentence, the state primarily contends that the seriousness of the offense requires a denial of probation. It also relies upon the enhancing factors that exist. Initially, we note that the trial court's findings and conclusions indicate that it may have viewed its choices to be the penitentiary or full probation, thereby ignoring split or periodic confinement as alternatives. However, its conclusion that confinement would serve no useful purpose in this case reflects that it considered full probation as the proper course to take.

In any event, we believe that the record justifies the trial court's decision. As the state asserts, probation can be denied due to the nature of the offense and that a negative factor, such as a criminal record, may be sufficient to support a denial of probation. See State v. Travis, 622 S.W.2d 529, 533-34 (Tenn. 1981); State v. Baron,

---

[2] We note that the state did not argue in the trial court that the violation of private trust enhancement factor should apply.

659 S.W.2d 811, 815 (Tenn. Crim. App. 1983). Unquestionably, the offense was serious in terms of the victim's injuries. However, such circumstances and criminal history are to be considered with all of the other relevant factors and the sentencing principles by the trial court. In this regard, as previously noted, it is apparent that the trial court did not find the criminal history to be as significant as the state asserts.

The trial court presided at the trial and the sentencing hearing, observing all of the witnesses. It heard the defendant's former wife present a litany of complaints about the defendant's previous conduct, but It observed the defendant refute or substantially minimize her testimony. It heard his explanation of prior marijuana use and his stopping such use before this case. It heard his account of his car striking his former wife's car at a low rate of speed and his mother's supporting account of the car damage being minimal. It heard his account of how he spanked his own child and of his denying any abuse. Also, it was provided substantial evidence at the sentencing hearing in favor of the defendant that would support probation.

Under the foregoing circumstances, the trial court chose to grant probation, noting that it was "taking a chance." The record before us would easily support a denial of probation. However, it also reflects that the trial court sufficiently considered the sentencing principles and the relevant facts and circumstances in the case so as to preserve the presumption of correctness for its determinations. In consequence, the grant of probation was within the trial court's discretion and we conclude that sufficient evidence exists to preclude us from finding an abuse of discretion that would authorize a reversal as a matter of law.

In consideration of the foregoing, and the record as a whole, the judgment of the trial court is affirmed.

 

_____
Joseph M. Tipton, Judge

CONCUR:

_____
David H. Welles, Judge

_____
Stephen M. Bevil, Special Judge